**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ASPEN SPECIALTY INSURANCE COMPANY
and LANDMARK AMERICAN INSURANCE
COMPANY,

Plaintiffs,

-against-

4 NYP VENTURES LLC,

Defendant.

13 Civ. 3367 (PAC)
ECF

Oral Argument Requested

---

**DEFENDANT 4 NYP VENTURES LLC'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

June 19, 2015

PILLSBURY WINTHROP SHAW PITTMAN LLP

Joseph D. Jean
Matthew Stockwell
1540 Broadway
New York, NY 10036
Tel: (212) 858-1000
joseph.jean@pillsburylaw.com
matthew.stockwell@pillsburylaw.com

Geoffrey J. Greeves (*pro hac vice*)
James P. Bobotek (*pro hac vice*)
Eric M. Gold (*pro hac vice*)
1200 Seventeenth Street, NW
Washington, D.C. 20036
Tel: (202) 663-8000
geoffrey.greeves@pillsburylaw.com
james.bobotek@pillsburylaw.com
eric.gold@pillsburylaw.com

*Attorneys for 4 Defendant NYP Ventures LLC*

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................................... 1

II.    STATEMENT OF FACTS ....................................................................................... 3

    A.    The Property and Application for Flood Insurance .................................................3

        1.   The Aspen and Landmark Policies ...................................................................4

        2.   The FM Policy Flood Deductible ....................................................................5

        3.   The FM Policy's Appendix F and General Change Endorsement
           No. 004...........................................................................................................6

    B.    Superstorm Sandy And Aspen's and Landmark's Wrongful Disclaimer
       of Coverage ............................................................................................................9

III.   LEGAL ARGUMENT.............................................................................................. 10

    A.    Applicable Summary Judgment Standard..............................................................10

    B.    Because No Deductible Applies to the Landmark Policy, Landmark
       Must Pay Its Limits...............................................................................................11

    C.    Because The FM Policy's Flood Deductible Provision Is Ambiguous, It
       Must Be Construed In 4 NYP's Favor, Resulting In Application Of A
       $100,000 Deductible To Aspen's Coverage .........................................................13

    D.    4 New York Plaza Was Not Listed On Appendix F, Resulting In
       Application Of A $100,000 Deductible .................................................................18

        1.   4 New York Plaza Was Not Listed on Appendix F .........................................18

        2.   4 NYP's Reasonable Expectation Was That A $100,000 Deductible
           Applied To Flood Losses ..............................................................................21

    E.    The Reference In The FM Policy's Property Damage Flood Deductible
       To The Valuation Provision Creates A Further Ambiguity...................................22

IV.    CONCLUSION........................................................................................................ 24

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...................................................................................... 10

*Belt Painting Corp. v. TIG Ins. Co.*,
  795 N.E.2d 15 (N.Y. 2003)........................................................................... 16

*Brown v. Eli Lilly & Co.*,
  654 F.3d 347 (2d Cir. 2011)......................................................................... 10

*Castle Oil Corp. v. Ace American Ins. Co.*,
  2014 WL 459904 (N.Y. Sup. Ct. Jan. 2, 2014).......................................... 15

*Cragg v. Allstate Indem. Corp.*,
  17 N.Y.3d 118, 950 N.E.2d 500 (2011)................................................. 15, 21

*Fed. Deposit Ins. Corp. v. Great Am. Ins. Co.*,
  607 F.3d 288 (2d Cir. 2010)......................................................................... 10

*Federal Ins. Co. v. International Bus. Machs. Corp.*,
  965 N.E.2d 934 (N.Y. 2012)................................................................... 14, 21

*Harrington v. Amica Mut. Ins. Co.*,
  223 A.D.2d 227 (N.Y. App. Div. 1996) ...................................................... 21

*Hartford Fire Ins. Co. v. Bonsera, Inc.*,
  177 Misc. 2d 55 (N.Y. Sup. Ct. 1998) ................................................... 19, 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)...................................................................................... 10

*Miller v. Continental Ins. Co.*,
  358 N.E.2d 258 (N.Y. 1976)......................................................................... 16

*Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*,
  472 F.3d 33 (2d Cir. 2006).............................................................. 15, 16, 24

*Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*,
  13 A.D.3d 599 (N.Y. App. Div. 2004) ........................................................ 16

*Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co.*,
  908 N.E.2d 875 (N.Y. 2009).......................................................................... 15

*Progressive Cas. Ins. Company v. C.A. Reaseguradora*,
  802 F. Supp. 1069 (S.D.N.Y.1992), *reversed on other grounds*, 991 F.2d 42
  (2d Cir.1993) ................................................................................................................ 20

*Rojas v. Roman Catholic Diocese of Rochester*,
  660 F.3d 98 (2d Cir. 2011) ........................................................................................... 10

*Seaboard Sur. Co. v Gillette Co.*,
  476 N.E.2d 272 (N.Y. 1984) .................................................................................... 14, 16

*Texas Indus., Inc. v. Factory Mut. Ins. Co.*,
  486 F.3d 844 (5th Cir. 2007) ...................................................................................... 2, 15

*Throgs Neck Bagels, Inc. v. GA Ins. Co. of New York*,
  241 A.D.2d 66 (N.Y. App. Div. 1998) .......................................................................... 15

*Travelers Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London*,
  760 N.E.2d 319 (N.Y. 2001) .......................................................................................... 23

*United States Fid. & Guar. Co. v. Annunziata*,
  492 N.E.2d 1206 (N.Y. 1986) ........................................................................................ 17

*Westchester Resco Co., L.P. v. New England Reins. Corp.*,
  648 F. Supp. 842 (S.D.N.Y. 1986) *aff'd*, 818 F.2d 2 (2d Cir. 1987) ...................................... 20

## Rules and Regulations

Fed. R. Civ. P. 56(a) ..................................................................................................... 10

Fed. R. Civ. P. 56.1 ......................................................................................................... 3

## Other Authorities

International Risk Management Institute, Inc.,
  http://www.irmi.com/online/cli/ch012/1l12c000/al12c030.aspx (last visited
  June 17, 2015) ................................................................................................................ 6

Defendant 4 NYP Ventures LLC ("4 NYP"), by counsel, for its Memorandum of Law in Support of its Motion for Partial Summary Judgment, states as follows.

I. **INTRODUCTION**

Following Superstorm Sandy, Defendant 4 NYP, a building owner, submitted a $146 million claim to its excess flood carriers Aspen Specialty Insurance Company ("Aspen"), Landmark American Insurance Company ("Landmark"), and Underwriters at Lloyd's[1] for payment up to their $100 million flood policy limits, subject to a $100,000 deductible. The loss was paid in part, but the excess flood carriers disallowed a vast portion of the claim due to an improper interpretation of the underlying flood deductible as $19.2 million.

To resolve the deductible issue, this Court must engage in a close reading of *sui generis* policy language in a master underlying property policy (the "FM Policy") that sits below the excess flood policies. This is so because the excess flood insurers may, in some respects, follow form to the primary FM Policy language. The FM Policy prescribes one of two flood deductibles: (i) $100,000 by default; or (ii) a multi-million dollar deductible if the property is scheduled on a separate "Appendix" attached to the policy. Months after 4 NYP's building was added as an insured location under the FM Policy, Factory Mutual Insurance Company ("FM") issued an endorsement adding 4 NYP's building to the policy's high-deductible Appendix without any insured's knowledge, and without the knowledge of the excess flood insurers. If the endorsement applies, the flood deductible is 192 times higher than 4 NYP was expecting it to be, rendering the coverage illusory.

Rather than tendering their limits to 4 NYP, Aspen and Landmark sued 4 NYP seeking a declaration that their policies, as issued, are subject to a $19.2 million deductible. They have

---

[1] The third insurer comprising the tower of second layer excess insurers is Underwriters at Lloyd's ("Lloyd's"). Lloyd's is not a party to this matter, but has entered into an agreement with Aspen and Landmark under which it shall be bound by the Court's determination herein.

never sought to reform their policies under New York's strict clear and convincing evidence standard, presumably because they cannot even come close to satisfying the standard.  A finding by this Court that the deductible is $100,000 would essentially end this case.

On summary judgment, the Court is required to determine the plain meaning of the deductible as a matter of law.  If there is an ambiguity, the contract must be strictly interpreted against the insurers.  A deductible below $250,000 was the reasonable expectation of 4 NYP, the building owner, and of the excess carriers at the time of contracting, and this interpretation is supported by form policy language, in flood deductible language found in similar master policies issued by the same FM Policy underwriter, and in insurance cases that require the insurer to state coverage-limiting provisions in clear and unmistakable language, which was not done. *See, e.g.*, *Texas Indus., Inc. v. Factory Mut. Ins. Co.*, 486 F.3d 844, 848-49 (5th Cir. 2007) (finding the exclusionary deductible language in an FM policy to be open to multiple reasonable interpretations and ambiguous, and holding that the uncertainty must be resolved "by adopting the construction that most favors the insured.")

Excess flood insurer Landmark, which insured 50% of the final $50 million layer (or $25 million of flood coverage), issued a policy which does not follow form to the FM Policy with respect to the deductible, and in fact contains no reference to an underlying deductible whatsoever.  Owing to the $50 million attachment point stated in Landmark's policy, its full limits are available to 4 NYP as a matter of law.

Months into their policy period, the excess flood insurers finally issued their policies. The excess underwriting files included a review of the FM Policy form containing the high-deductible appendix.  The 4 NYP location was not listed on that Appendix.  There is no claim of scrivener's error here, nor any alleged deviation from the excess insurers' customary

2

underwriting authority or practices.  While New York law on this issue is sparse, at least one case has held that subsequent "cardinal" changes are not binding on the insured unless it receives the endorsement.  It is undisputed that the tardy endorsement to the FM Policy was not seen by the named insured on the master policy (CBRE Group, Inc.), by the building owner (Defendant 4 NYP), or by the excess insurers who now urge a higher deductible (Aspen/Landmark/Lloyd's).  Because the endorsement did not surface until after Superstorm Sandy, these excess insurers never bargained for a higher deductible.

Finally, even if the disputed Appendix is effective, the FM Policy deductible language is otherwise ambiguous.  A reasonable construction of the language calls for the application of a much lower deductible than that urged by the excess flood insurers.  For all these reasons, 4 NYP is entitled to summary judgment that the excess carriers may not impose a $19.2 million deductible on 4 NYP's flood loss, and must instead pay their limits.

## II.    STATEMENT OF FACTS

### A.    The Property And Application For Flood Insurance

In May 2012, 4 NYP bought the real property and improvements in lower Manhattan known as 4 New York Plaza, New York, NY, an office building with approximately 1.1 million square feet of space, including three sub-surface levels and twenty-two above-grade levels ("the Building").  *See* 4 NYP's Rule 56.1 Statement of Facts ("SOF"), ¶ 1.  Contemporaneously with its acquisition, 4 NYP engaged CBRE, Inc. ("CBRE") as the Building's property manager, and added the Building as an insured location under CBRE's client-group master property insurance policy that was underwritten and issued by FM.  *See* SOF, ¶ 2.  As a condition of the loan, 4 NYP's lender, MetLife, required $100 million of dedicated flood insurance, with no deductible exceeding $250,000.  *See* SOF, ¶ 3.  4 NYP provided its lender's insurance-related requirements in conjunction with the application it submitted requesting inclusion of the Building on CBRE's

"all-risk" master property insurance policy, issued by FM, Policy No. UC089 (the "FM Policy"). *See* SOF, ¶ 4.

Effective May 22, 2012, the Building was added as an insured location under the already-existing FM Policy, which also insured many other insured locations throughout the United States. *See* SOF, ¶ 5. 4 NYP paid the full premium charged, which 4 NYP understood to include flood coverage for, *inter alia*, any property damage and business income losses at 4 New York Plaza, with a with a deductible that met its lender requirements. *See* SOF, ¶ 6. At closing of the Building's acquisition, 4 NYP received a certificate of insurance ("COI") evidencing the flood coverage provided under the FM Policy. *See* SOF, ¶ 6. The COI does not list a flood deductible and is incomplete. *See* SOF, ¶ 7. The reason it is incomplete is because it references a non-existent attachment listing applicable deductibles. *See* SOF, ¶ 7. This attachment was not provided to 4 NYP when it received the COI, and the COI does not otherwise provide information regarding the flood deductible under the FM Policy. *See* SOF, ¶¶ 6-7. Months later, at the time 4 NYP sustained its Sandy-related flood losses, 4 NYP had received neither a copy of the FM Policy nor any of its excess flood policies, and had in its possession only the incomplete COI to inform it of the coverage provided. *See* SOF, ¶¶ 6-8.

1.    The Aspen And Landmark Policies

Because FM was unwilling to provide flood coverage for the Building in excess of $20 million, 4 NYP was obligated to obtain excess flood coverage in order to comply with MetLife's loan conditions. *See* SOF, ¶ 3; 9-10. 4 NYP asked Aon Risk Services Northeast, Inc. ("Aon") to assist in procuring the additional $80 million of flood coverage. *See* SOF, ¶ 9. Aon, in turn,

engaged the assistance of a wholesale insurance broker, AmWINS Brokerage of Georgia, Inc. ("AmWINS"), to place the excess flood coverage.[2]  *See* SOF, ¶ 10.

The excess flood coverage was procured in two separate "towers," with the total limits of each tower of coverage being shared by several excess insurers under a quota-share arrangement. Thus, certain non-party insurers (the "First-Layer Excess Insurers") issued excess flood insurance policies to 4 NYP for their respective shares of $30 million in excess of the FM Policy's $20 million in coverage for "Flood" losses (the "First-Layer Excess Policies").  *See* SOF, ¶ 12.  Aspen, Landmark, and non-party Lloyd's, issued excess flood insurance policies to 4 NYP for their respective shares of $50 million in excess of $50 million (i.e., the aggregate of the $20 million flood sublimit under the FM Policy and the First- Layer Excess Insurers' $30 million limit) (the "Second-Layer Excess Policies").  *See* SOF, ¶ 13.  Thus, Aspen and Landmark issued excess flood insurance policies to 4 NYP, bearing policy numbers PJCAA4H212 and LHD376809, respectively, effective May 22, 2012 to May 22, 2013 (the Aspen and Landmark portions of the Second-Layer Excess Policies are collectively referred to herein as the "Excess Policies").  See SOF, ¶ 13.  The Aspen and Landmark Policies include excess flood limits of $15 million and $25 million, respectively, which limits are part of the $50 million second excess layer of 4 NYP's flood coverage for the Building.  See SOF, ¶ 14.

2.    The FM Policy Flood Deductible

The FM Policy's deductible provision states, in relevant part, as follows:

In each case of loss covered by this Policy, the Company will be liable only if the Insured sustains a loss, including any insured TIME ELEMENT loss, in a single Occurrence greater than the applicable deductible specified below, and only for its share of that greater amount.

\* \* \* \*

---

[2]  A "wholesale broker" refers to "those who do not work directly with the insured, but rather work with the insured's retail agent" to access either the admitted marketplace or the surplus lines or both to obtain insurance coverage. *See* SOF, ¶ 11.

D.  Flood

USD 100,000 for Property Damage and Time Element combined, per Occurrence except as respects Locations as described in Appendix F, the following will apply:

a) Property Damage - 5% of the value, per the VALUATION clause of the LOSS ADJUSTMENT AND SETTLEMENT section, of the property insured at the Location where the physical damage occurred, per Location.

b) Time Element - 5% of the full Time Element values that would have been earned in the 12 month period following the Occurrence by use of the facilities at the Location where the physical damage occurred and that proportion of the full Time Element values at all other locations where TIME ELEMENT loss ensues that was directly affected by use of such facilities and that would have been earned in the 12 month period following the Occurrence, per Location.

c) The above Flood deductibles are subject to a minimum deductible of USD100,000 for Property Damage and Time Element combined, per Location.

*See* SOF, ¶ 20.

3.     The FM Policy's Appendix F And General Change Endorsement No. 004

The FM Policy has a peculiar structure for identifying locations subject to higher deductibles in connection with its flood coverage.  Rather than commonsensically referring to them as "High Hazard Flood Locations," FM created a unique proxy – Appendix F – and removed any reference to high hazard locations in its policy's deductible language.  See SOF, ¶ 20-22.  Thus, only if one reads the FM Policy's Appendix F can locations that have a higher deductible be conclusively discerned, because that is the only reference.  See SOF, ¶ 20-22.

In other words, if an insured knew that its insured location was in a 100- or 500-year flood zone, and then read the FM Policy's deductible language, the insured still would not be able to identify the applicable flood deductible without an Appendix F listing the insured building (or not listing the building, as the case may be).[3]  *See* SOF, ¶ 20-21.  As of the May 22, 2012 date upon which the Building was added to the FM Policy under the COI, the Building was neither placed on the FM Policy's Appendix F, nor added to the FM Policy's listing of Appendix

---

[3]   By way of extreme example, if the Statue of Liberty were an insured location but the carrier neglected to put it on Appendix F, the deductible would be $100,000.

F locations.  *See* SOF, ¶ 23.  Prior to Sandy's annihilation of lower Manhattan, 4 NYP had no

reason to know that the FM policy included an Appendix F, because 4 NYP never received a

copy of the FM Policy. *See* SOF, ¶ 8, 23, 27.

Prior to issuing the Excess Policies, each of Aspen and Landmark received a copy of the

FM Policy.  *See* SOF, ¶ 15.  Both Aspen and Landmark's underwriting departments reviewed the

terms and conditions of the FM Policy, and its then-effective Appendix F, to make sure that the

FM Policy terms conformed to their excess policies.  *See* SOF, ¶ 16.  This review yielded no

discrepancies that were noted in the underwriting files.  *See* SOF, ¶ 16, 18.  Underwriters for

both Aspen and Landmark specifically testified and provided underwriting guidelines

demonstrating that they had authority to write a flood deductible that complied with 4 NYP's

lender requirements.[4]  *See* SOF, ¶ 17.  Neither underwriter took notice of the fact that the

Building was not referenced in Appendix F, and neither requested a copy of any endorsements to

the FM Policy.  *See* SOF, ¶ 18.

Thus, at the time each of Aspen and Landmark issued its excess policy, 4 NYP had no

indication that the Building was scheduled on Appendix F and, more importantly, no indication

that the applicable flood deductible would be anything other than $100,000.  The Excess Policies

"follow form" to the terms and conditions of the FM Policy, meaning that they are subject to the

FM Policy's terms, conditions, and exclusions, except to the extent that such terms, conditions,

and exclusions are expressly addressed in the Excess Flood Policies.[5]  *See* SOF, ¶ 19.

---

[4]  To "buy down" any deductible, 4 NYP purchased a NFIP policy with $1,000,000 limits from First American
    Property and Casualty Insurance Group.  *See* SOF, ¶ 41.

[5]  Not all follow form coverage is created equal. After identifying the follow form language in an umbrella or
    excess policy, the next step is to analyze the policy wording to determine (1) which policy is being followed, (2)
    which parts of the followed policy are intended to be incorporated by reference into the umbrella or excess policy,
    and (3) whether there are any exceptions to incorporation that would prevent the subject provision of the followed
    policy from governing the umbrella or excess policy.  *See, e.g., Interpretation of Follow Form Provisions*,
    International Risk Management Institute, Inc., http://www.irmi.com/online/cli/ch012/1l12c000/al12c030.aspx
    (last visited June 17, 2015).

As part of a periodic audit and review of the locations insured under the FM Policy, FM provided a property insurance invoice for the Building in July 2012. *See* SOF, ¶ 24. 4 NYP did not receive a copy of the invoice, which listed CBRE as the insured. *See* SOF, ¶ 25.

It was not until August 17, 2012 that FM issued an endorsement to the FM Policy, titled "General Change Endorsement No. 4." *See* SOF, ¶ 26. General Change Endorsement No. 4 confirmed the addition of the Building as an insured location under the FM Policy, effective as of May 22, 2012, and also identified the Building as an Appendix F location. *See* SOF, ¶ 26. This document, however, was never sent to 4 NYP prior to the October 29, 2012 date that Sandy hit Manhattan. *See* SOF, ¶ 27, 31-32. Nor was this document sent to CBRE prior to Sandy's occurrence. *See* SOF, ¶ 28.

Equally as important for purposes of this motion, neither the existence of General Change Endorsement No. 4 nor the purported inclusion of the Building on Appendix F was known to either Aspen or Landmark until after Superstorm Sandy exacted her wrath on the Building. *See* SOF, ¶¶ 16, 18, 29-30. There is no reference to General Change Endorsement No. 4 in the underwriting materials that Aspen and Landmark produced in discovery. *See* SOF, ¶ 29. The individual underwriters who bound the Aspen and Landmark policies testified at deposition that they had never heard of General Change Endorsement 4 prior to Sandy. *See* SOF, ¶ 30. It is undisputed that, prior to issuing their respective excess flood policies, the Landmark and Aspen underwriting departments had copies of the FM Policy which contained an Appendix F, and that their Appendix F did not list the Building. *See* SOF, ¶ 16, 18, 30.

Post-Sandy, on or about November 7, 2012, 4 NYP first received General Change Endorsement No. 4, which purported to add the Building to Appendix F pre-loss. *See* SOF, ¶ 27, 31-32. 4 NYP had no knowledge until this November 2012 date that the Building was to be

listed on Appendix F.  *See* SOF, ¶ 31-32.  Indeed, at the time 4 NYP became an additional

named insured under the FM Policy, the Building was not listed on Appendix F and the COI

made no reference to it or to a higher flood deductible.  *See* SOF, ¶¶ 7, 23.  More importantly, at

the time the Aspen and Landmark excess policies were bound, 4 New York Plaza was not listed

on Appendix F. *See* SOF, ¶¶ 16, 18, 23.  The only insurer who was aware of the change made

months later was FM, and FM did not inform Aspen, Landmark, non-party Lloyd's, CBRE (its

insured), or 4 NYP of this change.  *See* SOF, ¶¶ 16, 18, 23, 27-32.

> **B.**    <u>**Superstorm Sandy And Aspen's And Landmark's Wrongful Disclaimer Of
> Coverage**</u>

On October 29, 2012, Superstorm Sandy devastated lower Manhattan and inundated the

Building and its subsurface levels with floodwaters.  *See* SOF, ¶ 33.  In total, 4 NYP suffered

approximately $146 million in property damage and business interruption losses as a direct result

of Sandy.[6]  Because FM agreed that 4 NYP's losses were covered under the FM Policy's flood

coverage, FM paid 4 NYP the full $20 million constituting its policy's flood sublimit.  *See* SOF,

¶ 34.  FM did not apply a deductible when it made the $20 million payment to 4 NYP.  *See* SOF,

¶ 35.  Shortly after FM paid its flood limits to 4 NYP, the First-Layer Excess Insurers also paid

4 NYP their collective policy limits.  *See* SOF, ¶ 36.

4 NYP submitted its final flood claim to the Second-Layer Excess Insurers on September

12, 2014, which identified insured losses of approximately $146 million, subject to a $100,000

deductible, well in excess of the flood limits provided by the Excess Policies.  *See* SOF, ¶ 37.

Aspen and Landmark partially adjusted the claim.  Their adjustment credited 4 NYP with

approximately $98 million in insured losses.  *See* SOF, ¶ 38.  Therefore, on this basis, Aspen and

Landmark made partial payments to 4 NYP totaling $23,612,414.40 for the flood losses covered

---

[6]  Disputes over the claim quantum are being litigated by the parties.  If the Court grants this motion, the quantum
issue in this case will be moot.

under their respective Excess Policies.  *See* SOF, ¶ 39.  Aspen and Landmark applied a $19.2 million deductible to 4 NYP's loss.  *See* SOF, ¶ 40.  If 4 NYP is correct that the deductible is $100,000, Aspen and Landmark will owe the full limits of their respective policies to 4 NYP.

On May 17, 2013, Aspen and Landmark filed the instant suit against 4 NYP, seeking a declaration that the FM Policy's deductible must be satisfied before they make any further payment to 4 NYP, and that the applicable deductible is $19.2 million.  Neither Aspen nor Landmark has sought to reform its insurance policy; both have instead sought a declaration of the deductible as written.  In its counterclaim, 4 NYP has sued for a declaration that the applicable flood deductible is $100,000 and cannot be $19.2 million because nobody, save FM, knew of General Change Endorsement No. 4 before Sandy, and neither Aspen nor Landmark bound or issued its policy with the understanding that the Building was an Appendix F location.

## III.   LEGAL ARGUMENT

### A.   Applicable Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law,'" and "[a]n issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Similarly, the non-moving party cannot "rely on conclusory allegations or unsubstantiated speculation."  *Id.* (quoting *Fed. Deposit Ins. Corp. v. Great Am. Ins. Co.*, 607

F.3d 288, 292 (2d Cir. 2010)).

### B.    Because No Deductible Applies To The Landmark Policy, Landmark Must Pay Its Limits

Landmark and Aspen each seek a declaration that, "under the terms of the Second-Layer Excess Policies, they are liable to 4 NYP only for $50 million in covered Flood losses excess of $69.2 million in measurable covered Flood losses." *See* SOF, ¶ 42.  A review of the Landmark Policy, however, reveals that its attachment point begins at $50 million, and not $69.2 million, as the Landmark Policy makes no reference to an underlying deductible.  For this reason, as explained below, Landmark is not entitled, as a matter of law, to apply *any* deductible against the amounts it owes 4 NYP.

In order to gain an understanding of the point at which the Landmark Policy is triggered, one must review its applicable terms.  The Landmark Policy's "Limits" paragraph states, in relevant part, as follows:

> Provided always that liability attaches to the Company only after any self-insured retention and the primary and underlying excess insurer (s) have paid or admitted liability for the full amount of their respective ultimate net loss liability as set forth in Item 6 of the Excess Physical Damage Schedule and designated "Primary and Underlying Excess Limit (s)" and then the limits of the Company's liability shall be those set forth in Item 7 under the designation "Limit Insured" and the Company shall be liable to pay the ultimate net loss up to the full amount of such "Limit Insured."

*See See* SOF, ¶ 43.

While far from a model of clarity, this clause says Landmark's liability "attaches" after two events occur: (i) satisfaction of any self-insured retention; and (ii) the primary and underlying excess insurers' payment of those carriers' respective "ultimate net loss liability." First, it is undisputed that none of the FM Policy, the First-Layer Excess Policies, or the Second-Layer Excess Policies included a self-insured retention.  Thus, the first condition is met.

As to the second prerequisite, Item 6 of the Landmark Policy's Excess Physical Damage Schedule states that this amount is "$50,000,000 per occurrence and annual aggregate Flood."

11

*See* SOF, ¶ 43.  This provision makes no reference to any deductible, much less to the FM Policy's deductible.

Thus, Landmark's Policy attaches once any self-insured retention and the amounts set forth in Item 6 have been paid.  It cannot be disputed that: (i) the Landmark Policy includes no self-insured retention; and (ii) FM and the First-Layer Excess Insurers have collectively paid 4 NYP the amount of $50 million.  Accordingly, contrary to Landmark's contention, its policy is not subject to an underlying deductible, and Landmark is liable to 4 NYP for 4 NYP's losses that exceed the $50 million attachment point and fall within the ceiling of its monetary limits.

Landmark may contend that its policy is a "follow form" policy, meaning that it is subject to the terms and conditions of the FM Policy unless otherwise stated, and that it follows form to the underlying FM Policy deductible.  The Landmark Policy's "Maintenance of Primary Insurance" section expressly states, however, that it follows form "EXCEPT AS OTHERWISE PROVIDED HEREIN."  *See* SOF, ¶ 44 (emphasis in original).  As set forth above, the Landmark Policy's "Limits" section refers to the term "ultimate net loss," and also to the amounts set forth in Item 6 of the Policy's declarations, when it identifies its attachment point. The term "ultimate net loss" is a defined term in the Landmark Policy, and is not found anywhere in the FM Policy.  Indeed, it is defined as:

> the loss sustained by the Insured as a result of the happening of the perils covered by this Policy after making deductions for all salvages, recoveries, self-insured retentions and other valid and collectible insurance [other than recoveries under the policy(ies) of the primary and underlying excess insurer(s)].

*See* SOF, ¶ 45.  Thus, because Landmark included specific language in its policy with respect to its attachment point (a description of the underlying amounts necessary to trigger its coverage), Landmark cannot assert that it follows form to the FM Policy's deductible language.  This is so because Landmark's inclusion of the "ultimate net loss" concept constitutes language "otherwise

provided herein," thereby removing the attachment point issue from the provisions of the Landmark Policy that follow form to the FM Policy.

Moreover, the Landmark Policy references the amount of $50 million as the attachment point as set forth in Item 6 of the declarations. *See* SOF, ¶ 43. By comparison, the Aspen Policy utilizes similar language in its "Limits" section, but then expressly identifies on its declarations page that its limits are subject to the "underlying deductibles." *See* SOF, ¶ 46. Landmark is stuck with its policy language, as it has not sought reformation to include the FM Policy's deductible. Thus, 4 NYP is entitled to judgment as a matter of law that no underlying deductible applies against Landmark's attachment point.

**C.    Because The FM Policy's Flood Deductible Provision Is Ambiguous, It Must Be Construed In 4 NYP's Favor, Resulting In Application Of A $100,000 Deductible To Aspen's Coverage**

This Court has been asked to make a determination regarding the meaning of the FM Policy deductible. Because the deductible is a limitation on the coverage provided to 4 NYP, New York law requires that it be stated in clear and unmistakable language. The FM Policy's deductible provision, however, is ambiguous; its specific application to 4 NYP's losses remains unclear.

To the extent that any deductible applies, a $100,000 deductible is supported by the plain language of the FM Policy, black letter law dictating the proper method of interpreting insurance policies, and alternative deductible language available in other policies FM issued for the same period to other CBRE entities that were underwritten by the same FM underwriter, Steve Shivley. Accordingly, the FM Policy's deductible provision must be liberally construed in favor of 4 NYP and strictly against Aspen and Landmark, resulting in a maximum $100,000 deductible.

The FM Policy flood deductible states:

USD 100,000 for Property Damage and Time Element combined, per Occurrence except as respects Locations as described in Appendix F, the following will apply:

    a) Property Damage - 5% of the value, per the VALUATION clause of the LOSS ADJUSTMENT AND SETTLEMENT section, of the property insured at the Location where the physical damage occurred, per Location.

    b) Time Element - 5% of the full Time Element values that would have been earned in the 12 month period following the Occurrence . . .

    c) The above Flood deductibles are subject to a minimum deductible of USD 100,000 for Property Damage and Time Element combined, per Location.

*See* SOF ¶ 20.

Putting aside the issue of what constitutes Appendix F, the first clause of the flood deductible provision is fraught with grammatical peril. This is a run-on sentence. It is nonsensical and ambiguous, and under New York law, the provision is "not to be extended by interpretation or implication, but [is] to be accorded a strict and narrow construction." *Fed. Ins. Co. v. Int'l Bus. Machs. Corp.*, 965 N.E.2d 934, 938 (N.Y. 2012) (citing *Seaboard Sur. Co. v Gillette Co.*, 476 N.E.2d 272, 275 (N.Y. 1984) (emphasis added).

If this provision is read as a whole - as it must be - how does one account for the commas that set off the middle section of the clause? The clause appears to state that the deductible is $100,000 "for Property Damage and Time Element combined." What is unclear as a matter of grammar is to which part of the antecedent "the following" applies. Certainly, those sections, whatever they may be, have a deductible of 5% for property and time element damages.

Is it to the $100,000 for "Property Damage and Time Element combined," as appears to be the case through a plain, though illogical, reading of the provision?[7] Do the subsections apply per occurrence, or, as Aspen and Landmark will contend, to "Locations as described in Appendix F"? Looking at the language of the provision, there is no way to know, and it is incumbent on

---

[7] The deductible cannot possibly be both $100,000 and 5% because that interpretation produces the absurd result of requiring payment of two separate deductibles.

the insurers, not 4 NYP, to provide clear and unmistakable language.[8]  *See, e.g.*, *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006).

New York courts have specifically found that deductible provisions indicating how a deductible is to be calculated, like the one at issue here, are exclusionary clauses.  *See Castle Oil Corp. v. Ace American Ins. Co.*, 2014 WL 459904, at *5 (N.Y. Sup. Ct. Jan. 2, 2014) (holding that if "there is any ambiguity in the Policy endorsement as to how the deductible is to be calculated, this Court perceives no basis for departing with the general rule pertaining to ambiguities in insurance policy exclusionary clauses, which construes the provision liberally in favor of the insured and strictly against the drafter.") (citing *Cragg v. Allstate Indem. Corp.*, 17 N.Y.3d 118, 122, 950 N.E.2d 500 (2011)).  And the Fifth Circuit took issue with the wording of another FM Policy deductible, ruling against FM's interpretation and finding it ambiguous. *See Texas Indus., Inc. v. Factory Mut. Ins. Co.*, 486 F.3d 844, 848-49 (5th Cir. 2007) (finding the exclusionary deductible language in a FM policy to be open to multiple reasonable interpretations and ambiguous, and holding that the uncertainty must be resolved "by adopting the construction that most favors the insured.").

New York law "governing the interpretation of exclusionary clauses in insurance policies is highly favorable to insureds." *Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co.*, 908 N.E.2d 875, 876 (N.Y. 2009).  Where an insurer disclaims coverage by virtue of a policy exclusion, it "must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that [could] fairly be placed thereon." *Parks Real Estate Purchasing Grp.*, 472 F.3d at 42 (citing *Throgs Neck Bagels, Inc. v. GA Ins.*

---

[8]  As explained in detail below, FM policies issued by the same underwriter to other CBRE-related entities do not contain this grammatical error.  *See* SOF, ¶¶ 48-50.

*Co. of New York*, 241 A.D.2d 66, 71 (N.Y. App. Div. 1998)).  Importantly, "[t]he burden, a heavy one, is on the insurer, and [i]f the language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer." *Parks Real Estate Purchasing Grp.*, 472 F.3d at 42 (citing *Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*, 13 A.D.3d 599, 600 (N.Y. App. Div. 2004)).

Under this governing New York precedent, Aspen and Landmark cannot meet their heavy burden of showing that the deductible provision is not "doubtful or uncertain in its meaning," and their reading of the provision to restrict coverage only after payment of a $19.2 million deducible cannot withstand scrutiny.  To do so, Aspen and Landmark must show that the language of the deductible provision is clear, specific, unmistakable and capable of only one possible interpretation in order to be enforced.  *See, e.g.*, *Belt Painting Corp. v. TIG Ins. Co.*, 795 N.E.2d 15, 17 (N.Y. 2003); *Seaboard Sur. Co. v. Gillette Co.* 476 N.E.2d 272, 275 (N.Y. 1984); *Miller v. Continental Ins. Co.*, 358 N.E.2d 258, 260 (N.Y. 1976).  Based on the deductible provision's first clause and subsection (c), the only clear reading is that flood losses are subject to a $100,000 deductible for property damage and time element combined.

Neither Aspen nor Landmark can satisfy its burden of showing that its reading of this language is the only possible interpretation.  Had Aspen and Landmark wanted contract certainty on this point, they should have written a $19.2 million fixed sum deductible into their Excess Policies.  Under their "formula," that would always be the flood deductible because the Building value and time element value are non-variable.  As such, the language must be construed in favor of 4 NYP to require payment of a $100,000 deductible, at least under the Aspen Policy.

If Aspen and Landmark's interpretation of the provision is that the subsections apply to "Locations as described in Appendix F," the provision would need to be rewritten as follows:

16

"USD 100,000 for Property Damage and Time Element combined, per occurrence.  As respects Locations as described in Appendix F, the following will apply:".  But the provision is not written this way, and courts should "refrain from rewriting the agreement."  *U.S. Fid. & Guar. Co. v. Annunziata*, 492 N.E.2d 1206, 1207 (N.Y. 1986).

Indeed, correspondence with FM and alternative deductible language available in FM's own policies support a finding that the FM Policy's deductible provision is ambiguous.  For example, shortly after Sandy hit lower Manhattan, Aon's Rachael Robinson expressed her concern to FM's underwriter that the flood deductible language was ambiguous. *See* SOF, ¶ 47.  Further, FM's underwriter, Steve Shivley, testified that a separate policy that he underwrote on FM's behalf and issued to CBRE utilizes entirely different flood deductible language that, rather than using an Appendix F, expressly categorizes the locations subject to the deductible as those located in a 100-year flood zone.  *See* SOF, ¶ 48.

In yet another policy FM and Mr. Shivley underwrote and issued to a CBRE entity, he again refrained from identifying high hazard flood locations by scheduling them on an Appendix F, instead including language directly in the policy's flood deductible provision identifying the locations as "100-year flood zones as designated by the Federal Emergency Management Agency."  *See* SOF, ¶ 49.  Mr. Shivley also testified that still another policy he and FM underwrote and issued to CBRE for a prior year did not include the Appendix F concept, instead using an identifier different from the FM Policy and the two other policies discussed above.  In this policy, the flood deductible for high hazard flood zones was identified as "100-year flood zone as described by the Federal Emergency Management Agency, FEMA, or equivalent for locations outside the United States." *See* SOF, ¶ 50.

This alternative deductible language available in FM's own policies to other CBRE

entities supports a finding that the FM Policy's deductible provision is ambiguous. The terms of the FM Policy may not be rewritten to allow Aspen's and Landmark's strained reading of the flood deductible provision to require a deductible almost 200 times larger than that 4 NYP believed existed when it purchased coverage.

### D.    4 New York Plaza Was Not Listed On Appendix F, Resulting In Application Of A $100,000 Deductible

Even if it is determined that the FM Policy's flood deductible provision is unambiguous, the provision still must be read to require application of a $100,000 deductible to 4 NYP's losses. This is true because: (i) the FM Policy in 4 NYP's, Aspen's, and Landmark's possession prior to Sandy specifically incorporated an Appendix F that did not include 4 New York Plaza, providing no basis for any party to believe that 4 NYP's deductible would be anything other than $100,000; and (ii) this provision is not a "usual" or "stereotypical" coverage limitation, which requires this Court to interpret the deductible provision to give effect to 4 NYP's reasonable expectation that regarding the applicable deductible. At the time of the loss, 4 NYP's understanding was (and is) that the FM Policy's flood coverage carries a deductible that did not exceed 4 NYP's $250,000 lender limit; neither Aspen nor Landmark can identify any facts to the contrary.

### 1.    4 New York Plaza Was Not Listed On Appendix F

In asserting that the FM Policy's deductible provision can be read unambiguously, which, as discussed above, it cannot, Aspen and Landmark contend that the proper reading of this provision is that the deductible is $100,000, "except as respects Locations as described in Appendix F." Next, Aspen and Landmark contend that, because the Building was eventually listed on Appendix F through issuance of an endorsement to the FM Policy, the proper deductible applicable to 4 NYP's property damage is "5% of the value, per the VALUATION clause of the LOSS ADJUSTMENT AND SETTLEMENT section, of the property insured at the

18

Location where the physical damage occurred, per Location" as stated in subsection (a) of the flood deductible clause. This interpretation, however, does not result in the conclusion Aspen and Landmark assert.

At no time prior to 4 NYP's Sandy-related losses did 4 NYP, Aspen, or Landmark have any documentation showing that 4 NYP was included on Appendix F. *See* SOF, ¶¶ 7, 18, 25, 27, 29-32. Therefore, even if the provision's subsection requires that a 5% deductible be applied to "Locations as described in Appendix F," no excess Flood insurer in privity with 4 NYP knew that the building was listed on Appendix F. Thus, the deductible applicable to 4 NYP's flood damages was and is $100,000.

While FM unilaterally issued an endorsement adding the Building to Appendix F after the FM, Aspen, and Landmark Policies were issued, New York courts have specifically held that where the interested parties did not know that coverage would be significantly altered by an endorsement, "the insured should not be bound by such a provision prior to receipt of the actual policy endorsement." *Hartford Fire Ins. Co. v. Bonsera, Inc.*, 177 Misc. 2d 55, 58 (N.Y. Sup. Ct. 1998).

In *Bonsera*, the court considered whether an endorsement to an insurance policy that limited recovery for physical loss of rented equipment to property covered by a "written lease or rental agreement" was enforceable with respect to a loss that occurred after the effective date of the endorsement, but prior to the delivery of the actual policy amendment to the insured. *Id.* at 56. In finding the endorsement unenforceable, the court reasoned that the New York Court of Appeals had "determined that there are two distinct types of terms in an insurance contract: the terms unique to the deal, over which the parties bargain and memorialize in a binder; and the terms that are the 'usual' or 'stereotypical' conditions and limitations, which are not bargained

19

over and which are spelled out fully for the first time in the policy." *Id.* at 57 (quoting *Westchester Resco Co., L.P. v. New Eng. Reins. Corp.*, 648 F. Supp. 842, 845 (S.D.N.Y. 1986) *aff'd*, 818 F.2d 2 (2d Cir. 1987)).

The court held that "if terms may fairly be characterized as 'usual' or 'stereotypical', they form a part of the policy even if not referred to in the binder; if not, not." *Id.* at 58 (quoting *Progressive Cas. Ins. Company v. C.A. Reaseguradora*, 802 F. Supp. 1069 (S.D.N.Y.1992), *reversed on other grounds*, 991 F.2d 42 (2d Cir.1993)).  This rule is premised on fundamental principles of contract law.  "A policy of insurance represents a contract between the insured and the insurer.  Like any other contract, a meeting of the minds with respect to the terms is essential." *Bonsera*, 177 Misc. 2d at 58.  As stated by the court in *Bonsera*, "unless it can be shown that the insured knew or should have known . . . that coverage would not apply, the insured should not be bound by such a provision prior to receipt of the actual policy endorsement." *Id*.

Under this precedent, the endorsement adding the Building to Appendix F should not be applied.  Doing so would cause the deductible to be up to 192-times higher than anticipated, vastly reducing the coverage 4 NYP and its lender reasonably expected to be in place.  Moreover, given that the FM Policy flood limits are $20 million, the coverage becomes illusory if the deductible equals that amount. *See Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*, 34 N.Y.2d 356, 361, 314 N.E.2d 37 (N.Y. 1974) (holding exclusionary provisions unenforceable because they "would render the coverage nearly illusory.").

There was no meeting of the minds with respect to the terms of the deductible provision, and neither Aspen nor Landmark can show: (i) that a provision requiring payment of a $19.2 million deductible is a "usual" or "stereotypical" limitation that was bargained over or spelled

out fully in the FM Policy, as required by New York courts; or (ii) that 4 NYP knew or should have known that coverage would not apply to its losses until after payment of an enormous $19.2 million deductible.  Because FM purported to add a new "non-standard" limitation on 4 NYP's coverage, this Court should find that the endorsement is inapplicable.

>    2.    4 NYP's Reasonable Expectation Was That A $100,000 Deductible
>          Applied To Flood Losses

That a $100,000 deductible applies to 4 NYP's Sandy-related losses is also informed by black letter law dictating the appropriate method by which insurance policies should be interpreted.  The tests to be applied in construing an insurance policy are common speech and the reasonable expectation and purpose of the ordinary businessman.  *Fed. Ins. Co.*, 965 N.E.2d 934, 936.  In this analysis, of paramount importance are the "reasonable expectations of the average insured." *Id.*; *Cragg*, 17 N.Y.3d at 122.  Indeed,

> [w]hen members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations. They should not be subjected to technical encumbrances or to hidden pitfalls and their policies should be construed liberally in their favor to the end that coverage is afforded "to the full extent that any fair interpretation will allow."

*Harrington v. Amica Mut. Ins. Co.*, 223 A.D.2d 222, 227 (N.Y. App. Div. 1996) (citations omitted).  4 NYP's lender requirements, which mandated a maximum deductible of $250,000, were submitted with its insurance application materials.  At no time did 4 NYP receive any information from any party stating that those requirements would not be met.  Instead, based on the language included in the certificate of insurance and the FM Policy in the parties' possession, 4 NYP's reasonable expectation and belief was that the deductible applicable to 4 New York Plaza would meet its lender requirements.  At no time prior to Sandy did 4 NYP, Aspen, or Landmark have a copy of the FM Policy that included the 4 New York Plaza location on Appendix F, and the Excess Policies were issued on that basis.  Indeed, testimony from Aspen's

and Landmark's own underwriters support this conclusion.  *See* SOF, ¶¶ 7, 18, 25, 27, 29-32.

Under clear New York precedent, 4 NYP should not be subjected to the "hidden pitfall" of an endorsement that exponentially increases the applicable deductible when 4 NYP, Aspen, and Landmark were not even aware of this monumental change prior to Sandy.  It is improper for Aspen and Landmark to rely on a version of Appendix F that includes 4 New York Plaza when they were not aware of it prior to the loss, and did not rely on it in issuing their respective excess policies.  4 NYP's "fair interpretation" should be accepted by this Court, and the FM Policy's deductible provision should be liberally construed in favor of 4 NYP to require application of a $100,000 deductible.

### E.    The Reference In The FM Policy's Property Damage Flood Deductible To The Valuation Provision Creates A Further Ambiguity

Even if this Court determines that the first clause of the deductible provision is not ambiguous, and finds that 4 New York Plaza was properly listed on Appendix F at the time 4 NYP sustained its Sandy-related losses, the proper calculation of the property damage deductible for flood is not five percent of the Building's value, as Aspen and Landmark contend, but rather 5% of the Building repair costs necessitated by Sandy.  To properly calculate the property damage deductible for flood (other than $100,000), one must look within the terms of the FM Policy's Valuation clause.  Subsection (a) of the FM Policy's deductible provision states:

> Property Damage - 5% of the value, per the VALUATION clause of the LOSS ADJUSTMENT AND SETTLEMENT section, of the property insured at the Location where the physical damage occurred, per Location.

*See* SOF, ¶ 20.  The Valuation clause, in turn, states in relevant part:

> **3.  VALUATION**
>
> Adjustment of the physical loss amount under this Policy will be computed as of the date of loss at the location of the loss, and for no more than the interest of the Insured, subject to the following:

* * * *

L.    On all other property, the loss amount will not exceed the lesser of the following:

1)    The cost to repair.

2)    The cost to rebuild or replace on the same site with new materials of like size, kind and quality.

3)    The cost in rebuilding, repairing or replacing on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.

4)    The selling price of real property or machinery and equipment, other than stock, offered for sale on the date of loss.

5)    The cost to replace unrepairable electrical or mechanical equipment, including computer equipment, with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages and/or represents an improvement in function and/or forms part of a program of system enhancement.

6)    The increased cost of demolition, if any, resulting from loss covered by this Policy, if such property is scheduled for demolition.

7)    The unamortized value of improvements and betterments, if such property is not repaired or replaced at the Insured's expense.

8)    The Actual Cash Value if such property is:

      a)    useless to the Insured; or

      b)    not repaired, replaced or rebuilt on the same or another site within two years from the date of loss.

*See* SOF, ¶ 51.

Because the provision specifically states that "the lesser" of these options applies, another interpretation of the five percent deductible component is the "cost to repair," which, based on 4 NYP's final flood claim to Aspen and Landmark, is approximately $87,211,000. *See* SOF, ¶ 37. If the Court applies a 5% property damage deductible based on repair costs, the deductible applicable to 4 NYP's property damage losses is $4.36 million.[9]

Given the maxim under New York law that when interpreting an insurance contract, a court must strive to "give meaning to every sentence, clause, and word," *Travelers Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London*, 760 N.E.2d 319, 326 (N.Y. 2001), to the

---

[9]    Under this paradigm, the time element portion of the deductible for flood would not vary because it is a fixed sum (5% of time element values is $1.45 million).

extent this reading is not correct, it is certainly a reasonable interpretation of the interplay between the deductible and Valuation clauses.  If this is not the proper reading of the deductible provision, there are multiple reasonable interpretations, thereby making the provision ambiguous.

As such, the deductible language must be "resolved in favor of the insured and against the insurer."  *See, e.g.*, *Parks Real Estate Purchasing Grp.*, 472 F.3d at 42.  As discussed above, Aspen and Landmark "must establish that the [deductible provision] is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and . . . that its interpretation of the exclusion is the only construction that [could] fairly be placed thereon."  *Id.* New York law also holds that, when interpreting an exclusion or other limiting language, such as the deductible language at issue here, "[t]he burden, a heavy one, is on the insurer, and [i]f the language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer." *Id.*  Accordingly, to the extent the FM Policy's deductible provision points to subsection L of the Valuation clause to determine the property damage portion of the flood deductible, it would result in a $4.3 million deductible.  Otherwise, the provision is ambiguous and should be construed in 4 NYP's favor.

IV.    **CONCLUSION**

For the reasons set forth above, Defendant 4 NYP respectfully requests that this Court enter judgment as a matter of law in 4 NYP's favor, finding that no deductible applies to the flood coverage under the Landmark Policy, and that a $100,000 deductible applies to the flood coverage under the Aspen Policy.

Dated:  June 19, 2015                    Respectfully Submitted,


                                         /s/ Geoffrey J. Greeves
                                         PILLSBURY WINTHROP SHAW PITTMAN LLP
                                         Joseph D. Jean
                                         Matthew Stockwell

1540 Broadway
New York, NY  10036
Tel: (212) 858-1000
joseph.jean@pillsburylaw.com
matthew.stockwell@pillsburylaw.com

Geoffrey J. Greeves (*pro hac vice*)
James P. Bobotek (*pro hac vice*)
Eric M. Gold (*pro hac vice*)
1200 Seventeenth Street, N.W.
Washington, D.C.  20036
Tel: (202) 663-8000
geoffrey.greeves@pillsburylaw.com
james.bobotek@pillsburylaw.com
eric.gold@pillsburylaw.com
*Attorneys for 4 Defendant NYP Ventures LLC*