UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

ASPEN SPECIALTY INSURANCE
COMPANY and LANDMARK AMERICAN
INSURANCE COMPANY,

              *Plaintiffs*,

    -against-

4 NYP VENTURES LLC,

             *Defendant*.

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2-25-16

13 Civ. 3367 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

    In May 2012, Plaintiffs Aspen Specialty Insurance Company ("Aspen") and Landmark American Insurance Company ("Landmark") sold $40 million in excess flood loss coverage to Defendant 4 NYP Ventures LLC ("4 NYP") in conjunction with Defendant's acquisition of an office building at 4 New York Plaza in flood-prone lower Manhattan. At the same time, Defendant procured $20 million in primary flood loss coverage by joining a preexisting master insurance policy issued by Factory Mutual Insurance Company ("FM").

    On October 29, 2012, Hurricane Sandy struck New York City, causing substantial damage to 4 New York Plaza. As of September 2014, Defendant claimed around $146 million in losses. Plaintiffs adjusted the claim to around $79 million. Plaintiffs have made partial payments on their $40 million in coverage; Defendant seeks the full amount.

    The present motion is limited to one discrete issue: What is the applicable deductible for flood coverage under the FM master insurance policy and, as a result, the threshold level of losses at which Plaintiffs are liable under their excess policies? Plaintiffs seek a declaration that, since FM added the property to a list of "High Hazard Flood Locations," a deductible of five

1

percent of the property's value (here $19.2 million) applies. Defendant disagrees and counterclaims, seeking a declaration that the deductible is at most $100,000.

The parties cross-move for summary judgment. The Court holds that the applicable flood coverage deductible is $19.2 million, as Plaintiffs contend. The Court dismisses Defendant's First Affirmative Defense, which asserts that the deductible is $100,000; and Defendant's Fourth Affirmative Defense, which asserts that that a $19.2 million deductible would render coverage illusory. Plaintiffs' motion is GRANTED; Defendant's motion is DENIED.

## BACKGROUND

**I.        4 NYP acquires $20 million in flood coverage under the FM Master Policy**

On May 22, 2012, Defendant acquired 4 New York Plaza (hereinafter "the property"). Def. 56.1 Stmt., Dkt. 87 ¶ 1. Prior to the date of acquisition, Defendant hired CBRE Group, Inc. ("CBRE") to manage the property and Edge Financial Advisors ("Edge") to procure property insurance. *Id.* ¶ 2; Pl. 56.1 Stmt., Dkt. 88 ¶ 16. Defendant's lender required $100 million in flood loss coverage for the property. Def. 56.1 Stmt. ¶ 3. To that end, Defendant directed Edge to initiate procedures to add the property as an insured location under CBRE's preexisting master property insurance policy with FM (the "FM Master Policy"), which covered hundreds of CBRE-managed properties. *Id.*; Pl. 56.1 Stmt. ¶¶ 2, 5. The FM Master Policy contains the following deductible provision for flood coverage:

Exceptions to Policy Deductible(s)

\*   \*   \*

E. Flood

USD100,000 for Property Damage and Time Element combined, per Occurrence except as respects Locations as described in Appendix F, the following will apply:

a) Property Damage - 5% of the value, per the VALUATION clause of the LOSS ADJUSTMENT AND SETTLEMENT section, of the property insured at the Location where the physical damage occurred, per Location.

b) Time Element - 5% of the full Time Element values that would have been earned in the 12 month period following the Occurrence by use of the facilities at the Location where the physical damage occurred and that proportion of the full Time Element values at all other Locations where TIME ELEMENT loss ensues that was directly affected by use of such facilities and that would have been earned in the 12 month period following the Occurrence, per Location.

c) The above Flood deductibles are subject to a minimum deductible of USD100,000 for Property Damage and Time Element combined, per Location.

Dkt. 91, Ex. 4 at 16, 19.

On April 26, 2012, approximately four weeks before Defendant's acquisition, Edge sent an email to CBRE requesting that the property be added to the FM Master Policy. Pl. 56.1 Stmt. ¶ 18. CBRE referred the request to Aon Risk Services Northeast ("Aon"); thereafter Aon communicated directly with Edge. *Id.* ¶ 22. On May 14, 2012, Aon sent a quote to Edge stating that FM was willing to provide $20 million in flood coverage, rather than the $100 million it usually provided to CBRE buildings under the FM Master Policy. Dkt. 86, Ex. 11. The quote also provided: "Please note the deductibles for Flood Insurance. If property is located within the high hazard Flood zone the deductible is 5% of the property's replacement cost value subject to a $100,000 minimum deductible." *Id.* at 3. The next day, Aon sent a revised quote, which set the property value at $384.2 million, consisting of $355.2 million in replacement value and $29

3

million in 12-month income. Dkt. 91, Ex. 17.

Edge (on Defendant's behalf) accepted the quoted terms and, on May 17, 2012, Aon sent Edge a certificate of insurance, confirming that the property was added to the FM Master Policy, effective May 22, 2012. Dkt. 85, Ex. E; Dkt. 86, Ex. 18. Defendant did not receive (and did not request) a copy of the FM Master Policy until after Hurricane Sandy. Pl. 56.1 Stmt. ¶ 75.

## II. 4 NYP acquires $80 million in excess flood coverage

Since FM was willing to provide only $20 million in flood coverage, Edge sought to purchase an additional $80 million in flood coverage to satisfy the $100 million requirement set by Defendant's lender. Edge asked Aon to assist it in making these purchases. Def. 56.1 Stmt. ¶ 9. Aon obtained $30 million in flood coverage, in excess of the FM Master Policy coverage, from several non-party insurers (the "First-Layer Excess Insurers"). *Id.* ¶ 12. Aon obtained the final $50 million in flood coverage, in excess of the FM Master Policy and First-Layer Excess Insurers' coverage, from Aspen, Landmark and non-party Lloyds (the "Second-Layer Excess Insurers"); Aspen's policy covers $15 million, Landmark's policy covers $25 million, and Lloyds' policy covers $10 million. *Id.* ¶¶ 13, 14.

On May 21, 2012, the day before the acquisition, and prior to purchasing the excess flood coverage, Aon sent Edge authorizations of property insurance from the excess insurers, including Aspen and Landmark. Dkt. 86, Ex. 34. The authorizations state that the excess policies follow form to the primary FM Master Policy, unless otherwise provided. Def. 56.1 Stmt. ¶ 19. As to the applicable deductible under the FM Master Policy, some of the excess insurer authorizations simply refer back to the FM Master Policy itself. Dkt. 86, Ex. 34 at 9, 14, 26, 37. But others are more specific. The Landmark authorization provides: "This excess policy will require the primary to have at a minimum the following: 5.00% Per Occurrence (Property Damage & Time Element)." *Id.* at 43. The Lloyds authorization provides that the FM Master Policy deductible is

4

"5% or $19,200,000." *Id.* at 19. And the authorization for one of the First-Layer Excess Insurer provides for "primary deductibles of 5%." *Id.* at 33.

The same day, Edge notified Aon to "bind as of May 22, 2012." Dkt. 86, Ex. 35. The excess insurance policies were issued, effective May 22, 2012. *Id.* Defendant did not receive (and did not request) the excess insurance policies (including Plaintiffs' policies) until after Hurricane Sandy. Pl. 56.1 Stmt. ¶ 75.

### III. FM issues General Change Endorsement No. 4

On occasion, FM issues endorsements to its FM Master Policy with backdated effective dates to, among other things, add or remove properties from the policy's Schedule of Locations and Appendix F for "High Hazard Flood Locations." For example, on May 15, 2012, FM issued General Change Endorsement No. 1, which added 19 properties and removed 46 properties from the Schedule of Locations, and added one property to Appendix F. Dkt. 91, Ex. 4 at 106-12. On May 18, 2012, FM issued a similar General Change Endorsement No. 2. *Id.* at 113-14.

On August 17, 2012, FM issued General Change Endorsements Nos. 3 and 4. General Change Endorsement No. 4 (hereinafter "GCE 4") added 4 New York Plaza to the Schedule of Locations, effective May 22, 2012, along with ten other properties. *Id.* at 117. It also added 4 New York Plaza to Appendix F and provided that the flood coverage limit for the property was $20 million (both effective May 22, 2012). *Id.* at 118-19. The same day, FM sent a copy of GCE 4 to Aon. Dkt. 86, Ex. 20. FM did not send or provide notice of GCE 4 to CBRE, Defendant, or Plaintiffs prior to Hurricane Sandy.

### IV. Defendant's Hurricane Sandy claim

On October 30, 2012, Defendant notified CBRE and Aon of its Hurricane Sandy claim. Pl. 56.1 Stmt. ¶ 77. As of September 12, 2014, Defendant claimed $146,609,202 in losses. *Id.* ¶ 78. In August 2013, Plaintiffs prepared an adjusted claim of $79,515,518. *Id.* ¶ 79.

To date, Defendant has collected $79.5 million. FM paid $20 million, its limit under the FM Master Policy. *Id.* ¶ 80. The First-Layer Excess Insurers paid $30 million, their limit under the First-Layer Excess policies. *Id.* ¶ 81. The Second-Layer Excess Insurers, including Plaintiffs, paid $29.5 million of their $50 million in coverage. *Id.* ¶ 82. Defendant seeks the remaining $20.5 million from the Second-Layer Excess Insurers. *Id.*

## DISCUSSION

### I.   Applicable Law

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court "resolve[s] all ambiguities and draw[s] all reasonable inferences in the light most favorable to the nonmoving party." *Summa v. Hofstra Univ.*, 708 F.3d 115, 123 (2d Cir. 2013). The Court grants summary judgment only where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Smith v. Cty. of Suffolk*, 776 F.3d 114, 121 (2d Cir. 2015).

"Generally, the courts bear the responsibility of determining the rights or obligations of parties under insurance contracts based on specific language of the policies." *State of N.Y. v. Home Indem. Co.*, 66 N.Y.2d 669, 671 (1985). "[T]he unambiguous provisions of an insurance policy, as with any written contract, must be afforded their plain and ordinary meaning, and [] the interpretation of such provisions is a question of law for the court." *Broad St., LLC v. Gulf Ins. Co.*, 37 A.D.3d 130-31 (N.Y. App. Div. 1st Dep't 2006).

### II.   Analysis

The Court concludes that the deductible for flood coverage under the FM Master Policy is $19.2 million. The policy's flood deductible provision provides that for Locations included on Appendix F, the deductible is five percent of the combined "value . . . of the property" and

6

"Time Element values that would have been earned in the 12 month period following the Occurrence." Dkt. 91, Ex. 4 at 19. FM properly issued GCE 4, which added the property to the Schedule of Locations and to Appendix F, both retroactive to the date Defendant agreed to coverage.[1] Since the property was added to Appendix F, the five percent flood deductible provision applies. And since the quote that Defendant agreed to provides for a combined property value plus time element of $384.2 million, the deductible is $19.2 million.

Defendant does not argue with those facts, and instead makes six arguments to avoid the conclusion; but none of the arguments hold water. *First*, Defendant contends that the FM Master Policy's flood deductible provision is ambiguous and must be construed in Defendant's favor. Dkt. 90 at 13-18. Defendant argues that the clause's first sentence ("USD100,000 for Property Damage and Time Element combined, per Occurrence except as respects Locations as described in Appendix F, the following will apply") is a "run-on sentence" that is "fraught with grammatical peril" due to its internal comma placement. *Id.* at 14. An insurance contract is ambiguous if its language is "susceptible of two reasonable interpretations." *MDW Enter., Inc. v. CAN Ins. Co.*, 4 A.D.3d 338, 340-41 (N.Y. App. Div. 2d Dep't 2004). Here there is only one reasonable interpretation. By default, the flood deductible is $100,000. But if the location is included on Appendix F, the subsequent listed conditions apply instead. The clause is unambiguous. And contrary to Defendant's argument, the clause is not ambiguous simply because it could have been worded differently. *See Fed. Ins. Co. v. I.B.M. Corp.*, 18 N.Y.3d 642, 650 (2012) ("There are often many ways of effectively conveying the same meaning and the question is not simply whether the insurer could have phrased the provision differently.").

*Second*, Defendant contends that it reasonably believed it was not subject to a five

---

[1] The FM Master Policy's "Policy Modification" provision states: "This Policy can be changed only by endorsements issued by [FM] and made a part of this Policy." Dkt. 91, Ex. 4 at 85.

7

percent deductible since it did not receive notice of GCE 4 until after Hurricane Sandy. Dkt. 90 at 18-22. Defendant's actions belie its contention. Edge (acting on Defendant's behalf) negotiated the terms under which the property would be added to the FM Master Policy at the same time as it negotiated the terms of insurance with the First- and Second-Layer Excess Insurers. Whereas the FM Master Policy itself is not explicit as to the applicable deductible, Defendant's understanding of the applicable deductible—as represented in the terms it agreed to with the Excess Insurers—could not be any clearer. Defendant's insurance authorizations with Landmark and a First-Layer Excess Insurer require a five percent primary deductible. Dkt. 86, Ex. 34 at 33, 43. Defendant's insurance authorization with Lloyds does the calculation by providing that the FM Master Policy deductible is "5% or $19,200,000." *Id.* at 19. "The practical interpretation of an agreement by a party to it is always a consideration of great weight. . . . There is no surer way to find out what parties meant, than to see what they have done." *IBJ Schroder Bank & Tr. Co. v. Resolution Tr. Corp.*, 26 F.3d 370, 374 (2d Cir. 1994). Since Defendant entered into agreements that state that the FM Master Policy's deductible is five percent or $19.2 million at the same time as it entered into the FM Master Policy, it is unreasonable for Defendant to now claim ignorance or surprise when FM formally memorialized the $19.2 million deductible in GCE 4.

Further, even if Defendant's notice of GCE 4 is relevant or necessary, the undisputed facts demonstrate it is satisfied here. It is undisputed that FM notified Aon when it issued GCE 4. Since, for the reasons described below, Aon acted as Defendant's agent for purposes of procuring coverage under the FM Master Policy, Aon's knowledge is imputed to Defendant as a matter of law. *See Ribacoff v. Chubb Grp. of Ins. Co.*, 2 A.D.3d 153 (N.Y. App. Div. 1st Dep't 2003) ("An insurance broker is an agent of the insured. As such, the latter is bound, as principal, by notice to or knowledge acquired by the agent.") (internal citation omitted).

8

The record demonstrates that Defendant engaged Edge to procure property insurance, which in turn engaged Aon (an insurance broker) to secure the property's addition to the FM Master Policy and to procure $80 million in excess coverage (in order to meet the lender's $100 million coverage requirement). Aon sent quotes to Edge, and Edge accepted the proposed terms on Defendant's behalf. That Aon acted on Defendant's behalf to procure all the flood coverage that Defendant needed (including the excess insurance policies to which FM was not a party), demonstrates that Aon acted as Defendant's agent, and not as FM's agent. And New York law confirms that, as a general matter, insurance brokers act as an agent of the insured. *2540 Assoc., Inc. v. Assicurazioni Generali, S.P.A.*, 271 A.D.2d 282, 284 (N.Y. App. Div. 2d Dep't 2000) ("It is settled that an insurance broker is the agent of the insured."). All agree that Aon was on notice of GCE 4 when it was issued, and that knowledge is properly imputed to Defendant.[2]

*Third*, Defendant argues Landmark cannot enforce the FM Master Policy's deductible provision against it because Defendant's policy with Landmark does not specifically reference an underlying primary deductible. Dkt. 90 at 11-13. Defendant focuses on the "Limit" section of the Landmark policy, which provides that Landmark's liability attaches once the "primary and underlying excess insurer(s) have paid or have admitted liability for the full amount of their respective ultimate net loss liability." Dkt. 85, Ex. J at 11. But, as described above, the primary FM Master Policy and GCE 4 unambiguously provide for a primary deductible of $19.2 million. So FM's primary liability attaches only after Defendant incurs $19.2 million in losses, the First-Level Excess Insurers liability attaches only after Defendant incurs $39.2 million in losses,

---

[2] Defendant seeks to disassociate itself from Aon by suggesting that Aon acted as CBRE's agent. Even if so, the end result is the same. It is undisputed that Defendant hired CBRE to manage its building and to add the property to CBRE's master policy with FM. As such, CBRE acted as Defendant's agent. Regardless of whether Aon operated as Defendant's agent directly or through CBRE, Aon's knowledge is imputed to Defendant.

and Landmark's liability attaches only after Defendant incurs $69.2 million in losses. As such, the Landmark policy does incorporate the primary deductible. And even assuming the Landmark policy is ambiguous, the authorization for the policy explicitly provides for an underlying deductible of at least five percent of the property's value. Dkt. 86, Ex. 34 at 43; *see also Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 429 (2d Cir. 1992) ("If ambiguity is found . . . extrinsic evidence may properly be considered in the search for the contracting parties' intent."). Landmark can enforce the FM Master Policy flood deductible against Defendant.

*Fourth*, Defendant contends that it is not bound by GCE 4 because its rights emanate from the certificate of insurance rather than GCE 4. Dkt. 98 at 19-20. This argument fails because the certificate of insurance contains a disclaimer that it "is issued as a matter of information only and confers no rights." Dkt. 91, Ex. 54 at 4; *see also 10 Ellicott Sq. Court Corp. v. Mountain Valley Indemnity Co.*, 634 F.3d 112, 122 (2d Cir. 2010) ("A certificate of insurance is merely evidence of a contract for insurance, not conclusive proof that the contract exists, and not, in and of itself, a contract to insure."). Defendant is bound by the FM Master Policy and GCE 4.

*Fifth*, Defendant asserts that the FM Master's Policy's flood deductible provision is ambiguous because it could be read to cap the deductible at five percent of the "cost to repair," which is less than $19.2 million. Dkt. 90 at 22-24. Defendant points to the language in the deductible provision which states that the "Property Damage" portion of the deductible is calculated as "5% of the value, *per the VALUATION clause of the LOSS ADJUSTMENT AND SETTLEMENT section*, of the property insured at the Location where the physical damage occurred." Dkt. 91, Ex. 4 at 19 (emphasis added). The VALUATION clause provides that "the loss amount will not exceed . . . [t]he cost to repair." *Id.* at 74. Defendant contends therefore that the deductible can be no more than five percent of the cost to repair. And since repair costs

10

(in Defendant's view) are approximately $87,211,000, the deductible can be no more than $4.36 million. Dkt. 90 at 23. Plaintiffs counter that the "per the VALUATION clause" language is included simply to note that there are different methods for calculating damages to different types of property, and not to modify or limit the clear language that "Property Damage" is calculated as "5% of the value . . . of the property insured." Dkt. 93 at 23-25.

Reading the deductible clause in the context of the entire policy, Plaintiffs' interpretation is clearly correct. The policy's "Value Reporting Provisions" states that the insured must provide each year by a fixed date "Property values in accordance with the VALUATION clause of the LOSS ADJUSTMENT AND SETTLEMENT section." Dkt. 91, Ex. 4 at 14-15. That provision clearly contemplates that property values are known and fixed, despite the similar reference to the VALUATION clause. But under Defendant's interpretation, such values would be variable and potentially limited by hypothetical future repair costs. Since that reading is illogical and cannot be applied to the Value Reporting provision, it also cannot be applied to the deductible provision. The policy as a whole is logical only if read with Plaintiffs' interpretation.[3]

*Finally*, Defendant argues that interpreting the FM Master Policy to impose a $19.2 million deductible results in illusory coverage. Dkt. 98 at 6-7. Insurance coverage is illusory where the insured purchases no effective protection. *See* 7 Couch on Ins. 3d, § 101:20 (West 1997); *see also Truck Ins. Exch. v. Ashland Oil, Inc.*, 951 F.2d 787, 790 (7th Cir. 1992) (illusory contracts are "hopelessly or deceptively one-sided"). "[A]n insurance policy is not illusory if it provides coverage for some acts; it is not illusory simply because of a potentially wide exclusion." *Assoc. Cmty. Bancorp, Inc. v. St. Paul Mercury Ins. Co.*, 118 A.D.3d 608, 608 (N.Y.

---

[3] Furthermore, even if the reference to the VALUATION clause introduces ambiguity, extrinsic evidence removes that ambiguity. The authorization for Defendant's excess policy with Lloyds unambiguously states that the FM Master Policy's flood deductible is "$19,200,000." Dkt. 86, Ex. 34 at 19. Defendant should be held to its agreed-upon interpretation of the FM Master Policy.

11

App. Div. 1st Dep't 2014) (internal quotation marks omitted). Since the FM Master Policy affords Defendant $20 million in flood loss coverage on top of the $19.2 million deductible (which FM has in fact paid to Defendant), the coverage is not illusory.

Defendant relies on a recent New York Appellate Division opinion in *Littlejohn v. Dominos Pizza LLC*, 130 A.D.3d 500 (N.Y. App. Div. 1st Dep't 2015). There the court noted that, while "irrelevant for purposes of this appeal," coverage under an insurance policy would be illusory if the policy had a deductible equal to a coverage limit. *Id.* at 501-02. The Court does not read that cursory comment, added in dicta and devoid of any factual background or explanation, to upset the longstanding definition of what constitutes illusory coverage. Defendant has in fact collected tens of millions of dollars in flood losses, even if subject to a $19.2 million deductible. Such coverage is not illusory.

## CONCLUSION

The Court GRANTS summary judgment for Plaintiffs and DENIES summary judgment for Defendant, holding that the applicable flood deductible is $19.2 million. The Court dismisses Defendant's First and Fourth Affirmative Defenses.

The parties are directed to appear at a conference scheduled for Thursday, March 10 at 10:30 a.m., in Courtroom 14C. The Clerk is directed to terminate the motions at Dkt. 83 and 84.

Dated: New York, New York  
      February 25, 2016

SO ORDERED

*[signature]*

PAUL A. CROTTY  
United States District Judge